Christian W. Hancock - 027744
BRADLEY ARANT BOULT CUMMING LLP
Truist Center
214 North Tryon Street, Ste. 3700
Charlotte, NC 28202
Telephone: (704) 338 6089
chancock@bradley.com

G. Benjamin Milam *(Pro Hac Vice)*
BRADLEY ARANT BOULT CUMMING LLP
Truist Center
214 North Tryon Street, Ste. 3700
Charlotte, NC 28202
Telephone: (704) 338-6000
bmilam@bradley.com

*Attorneys for Defendants Paramount Residential Mortgage Group, INC., and Cenlar FSB*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

| | |
|---|---|
| George Calcut, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Paramount Residential Mortgage Group Incorporated, *et al.*,<br><br>Defendants. | Case No. 2:22-cv-01215<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Despite obtaining and accepting a VA loan modification, Plaintiffs in this mortgage dispute seek damages because they contend they should have received other, purportedly superior, options for a modification. Plaintiffs also seek relief for a credit reporting error but do not bring a claim under the Fair Credit Reporting Act, apparently recognizing such a claim would fail because the error was promptly corrected. Instead, Plaintiffs attempt to shoehorn their lawsuit into claims under the Real Estate Settlement Procedures Act ("RESPA"), the Arizona Consumer Fraud Act ("ACFA"), and common law negligence. Because Plaintiffs cannot meet the elements of these claims, Defendants are entitled to summary judgment. In the alternative, the Court should grant partial summary judgment for lack of supporting evidence as to certain categories of Plaintiff's damages, including damages related to Plaintiffs' voluntary decision to refinance with another lender at a

higher interest rate; damages to credit and reputational injury; and punitive damages.

## STATEMENT OF FACTS

On April 17, 2020, Plaintiffs obtained a mortgage loan from PRMG in the amount of $253,800 ("Loan") to refinance a property located 6652 E. Virginia Street, Mesa, Arizona 85215 (the "Property"). *See* **Ex. A-1** (Note), **Ex. A-2** (Deed of Trust); Statement of Facts ("SOF") at ¶ 1. The Loan was sub-serviced by Cenlar at all times relevant to this litigation. *See* **Ex. A** (D. McCormick Aff.) at ¶ 6. The loan is guaranteed by the Department of Veterans Affairs. *See generally* **Exs. A-2** and **A-3**.

**Forbearance Period and Loan Modification**: On November 2, 2020, the Plaintiffs requested a CARES Act forbearance on their loan obligations. *See* **Ex. A-3** (Servicing Notes) at 57, **Ex. A-4** (11.04.2021 Letter). Plaintiffs requested and were given two extensions on their forbearance period in March 2021 and May 2021. *See* **Ex. A-4** (11.04.2020 Letter Re. Request for Forbearance), **Ex. A-5** (03.15.2021 Letter Confirming Extension of Forbearance), **Ex. A-6** (05.11.2021 Letter Confirming Extension of Forbearance). On May 28, 2021, Mr. Calcut contacted Cenlar and stated he was interested in ending forbearance and finding options to restart payments so he could eventually refinance the property with a new loan. *See* **Ex. A** at ¶ 12; SOF at ¶ 2. Following this conversation, Cenlar considered Plaintiffs for options to bring their loan current and resume payments. *Id*. at ¶ 13.

On June 1, 2021, Cenlar sent Plaintiffs a letter confirming they were approved for a trial payment plan with the first payment due July 1, 2021. *See* **Ex. A-7** (06.01.2021 Trial Payment Plan Letter); SOF at ¶ 3. The trial payment plan letter provided projected loan

- 2 -

terms, including an estimated interest rate of 3.5%. *Id.* SOF at ¶ 3. Plaintiffs began making trial payments as contemplated by the terms of the plan. *See* **Ex. A-10** (Loan Payment History).

The Plaintiffs successfully completed the three required trial payments and, on September 3, 2021, were offered a permanent modification which capitalized past due amounts, extended the loan term, and increased the interest rate to 3.375%. *See* **Ex. A-8** (09.03.2021 Loan Modification Letter). Plaintiffs accepted the permanent modification by signing it on September 15, 2021. *See* **Ex. A-9** (Executed Loan Modification); SOF at ¶ 8.

**Credit Reporting Error and Cenlar's Corrections:** Although it was Cenlar's practice to suppress credit reporting for loans in forbearance and a subsequent trial plan, Cenlar mistakenly reported the loan as 180 days delinquent for the month of July 2021. *See* **Ex. A** at ¶ 16, **Ex. A-3** at 35–36; SOF at ¶ 4. Cenlar and PRMG acknowledged the error and timely submitted corrections to the credit bureaus on August 16, 2021, in response to credit disputes submitted by Mr. Calcut. *See* **Ex. A-11** (ACDV Reports); SOF at ¶¶ 4–5. Cenlar reaffirmed these corrections in response to additional credit disputes submitted by Mr. Calcut on September 18, 2021, and October 28, 2021. *See* **Ex. A-3** at 21, 10, **Ex. A-11**; SOF at ¶¶ 6, 12. Defendants have no control over the credit bureaus or their implementation of corrections, but records received in discovery indicate the corrections were acknowledged by all of the bureaus within a few months of the initial error. *See* **Ex. B** (Trans Union Documents), **Ex. C** (Experian Documents), **Ex. D** (Equifax Documents); SOF at ¶¶ 6,7, 13.

Plaintiffs submitted complaints to the Consumer Financial Protection Bureau

regarding both credit reporting and their contention they should have been offered a "deferment" option for their past due loan payments. *See* **Ex. A-12** (08.05.2021 CFPB Complaint Response), **Ex. A-13** (10.26.2021 CFPB Complaint Response); SOF at ¶¶ 4, 11. Cenlar and PRMG timely responded to these complaints, acknowledging the credit reporting error but denying any error with regards to the loan modification. *See* **Ex. A-12**, **Ex. A-13**. SOF at ¶¶ 4, 11.

**Plaintiffs' 2022 Refinance:**  On May 31, 2022, after completing a VA-mandated 6-month seasoning period following the modification, Plaintiffs refinanced their loan with United Trust Bank ("UTB"). *See* **Ex. E** (UTB Mortgage); SOF at ¶¶ 14–15. The new loan increased Plaintiffs' interest rate to 4.75%.  Plaintiffs paid off the Loan, paid off $36,283.00 in credit card debt, and received $101,297.72 in cash from the refinance. *Id.*; *see also* **Ex. F** (UTB Closing Disclosures), **Ex. G** (George Calcut Dep.) at 47:17–48:6; SOF at ¶¶ 14.

## STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  After the movant has identified issues where there is no genuine issue of material fact, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the non-moving party bears the burden of proof, the moving party need only point to the absence of any fact issue in the record, and the evidentiary burden then shifts to the non-moving party to show "significant probative" evidence of a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court must view the evidence in the light most favorable to the

non-moving party. *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

**ARGUMENT**

**I.   Plaintiffs' claim that they should have received a different kind of loan modification is not an "error" under RESPA.**

In their RESPA claim, Plaintiffs contend Defendants did not timely respond to requests to correct errors within the meaning of 12 U.S.C. 2605(k)(1)(C).[1] (Compl. at ¶¶ 64–73). But Plaintiff's complaints as to their loan modification do not state a valid claim under RESPA because they do not concern an "error" within the scope of the statute.

**A.   RESPA does not address purported errors in a servicer's decision to offer a specific loan modification option**

12 U.S.C. § 2605(k)(1)(C) states that a servicer of a federally related mortgage loan shall not "fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." Plaintiffs do not allege any error in the allocation of their payments, calculation of payoff totals, or a wrongful foreclosure, and must therefore demonstrate an error that relates to a "standard servicer's duty."

A "servicer" is the "person responsible for servicing of a loan." 12 U.S.C.A. § 2605 (i)(2). Section 2605(i)(3) defines "servicing" to include only duties relating to the implementation of an active loan. Specifically, "servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the

---

[1] The Complaint also references 12 U.S.C. § 2605(k)(1)(E), relating to a servicer's failure to comply with regulations established by the Consumer Financial Protection Bureau, but does not point to any CFPB regulation they assert Defendants have violated.

payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." *Id*.

Under this definition, the Ninth Circuit has concluded that a "request for modification of a loan agreement . . . does not concern the loan's servicing." *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 667 (9th Cir. 2012); s*ee also Watson v. Bank of Am., N.A.*, No. 16CV513-GPC(MDD), 2016 WL 6581846, at *6 (S.D. Cal. Nov. 7, 2016) ("[R]equests relating to loan modification are not related to 'servicing' of the loan"); *Bermudez v. SN Servicing Corp.*, No. 2:22-CV-01246-KJM-DB, 2023 WL 3025151, at *3 (E.D. Cal. Apr. 20, 2023); *Morgan v. Caliber Home Loans, Inc.,* 26 F.4th 643, 651 (4th Cir. 2022) (finding that a "loan modification is a contractual issue, not a servicing matter").

Nor do the implementing regulations for RESPA impose standards by which the Court could determine that a particular modification offer was in "error." The CFPB's regulation addressing loss mitigation procedures, 12 CFR § 1024.41, expressly disclaims a servicer's obligation to provide borrowers with "any specific loss mitigation option." The District Court has accordingly observed that "RESPA does not impose a duty on a servicer to provide any borrower with any specific loss mitigation option." *Garcia v. JPMorgan Chase Bank NA*, No. CV-15-01493-PHX-DLR, 2017 WL 1311668, at *11 (D. Ariz. Apr. 5, 2017); *see also Hermosillo v. Caliber Home Loans Inc.,* No. CV-15-02052-PHX-ESW, 2017 WL 2653039, at *9 (D. Ariz. June 20, 2017).

As illustrated by these decisions, Cenlar's modification offer to the Plaintiffs, and their acceptance, was a contractual decision between the parties and not a servicing obligation regulated by RESPA. RESPA simply does not guarantee to Plaintiffs a loan

modification of their choosing. Plaintiffs nevertheless argue that they should have been presented with other loan modifications and not "steered" to a VA Disaster Loan Modification, inviting this Court to decide what contractual terms should have been offered to the Plaintiffs. Because nothing in the Act suggests an intent by Congress to fundamentally alter the free negotiation of contracts by dictating modification decisions, or to impose liability for "errors" in those decisions, the RESPA claim must be dismissed.

**B.     VA regulations did not require Defendants to offer Plaintiffs a modification under the COVID-19 Veterans Assistance Partial Claim Program**

Plaintiffs' contention that Defendants were obliged to offer them a modification under the COVID-19 Veterans Assistance Partial Claim Program ("COVID-19 VAPCP") (*see* Compl. ¶¶ 56-58) misconstrues the nature of the VA Home Loan Guaranty Program. The COVID-19 VAPCP did not become effective until July 27, 2021, nearly two months *after* Cenlar offered Plaintiffs a trial payment plan for a VA Disaster Modification. *See* 86 FR 28692-01, **Ex. A-7**; SOF at ¶ 3.

When the program did become available, the VA expressly declined to make the program mandatory. In its Final Rule, the agency explained that because under the VA's guaranty scheme lenders and servicers "bear significantly more financial risk than the Government . . . the VA decline[d] to require servicers to offer a partial claim payment to veterans, particularly as part of a prescribed waterfall of home retention options." 86 FR 28692-01 at 28695. The agency further stated it was "amending the final rule to clarify that a servicer *may consider* a partial claim option *in the same way that a servicer may consider any of VA's other home retention options*." *Id.* (emphasis added).

Cenlar did not begin offering modifications under the COVID-19 VAPCP program

- 7 -

until October 2021, after the Plaintiff had been offered and accepted a VA Disaster Modification. Even if Cenlar had begun utilizing the program on the first day it was authorized by the VA, Cenlar would nevertheless have had discretion over which VA-authorized foreclosure intervention option to extend, including the VA Disaster Modification. Plaintiffs were offered, and accepted, a modification that was fully compliant with VA guidelines.

## II. Plaintiffs' credit reporting disputes do not give rise to a claim under RESPA

### A. RESPA does not address corrections to credit reporting errors

Cenlar has acknowledged it initially reported the Plaintiffs' loan as 180-days past due in July 2021. Although this conformed to the contractual due date for the Loan, the reporting should have been suppressed because Plaintiffs were in COVID-19 forbearance and subsequently in a trial payment plan. Cenlar timely corrected its reporting in response to disputes submitted by Mr. Calcut to the credit bureaus. *See* **Ex. A-11**, SOF at ¶¶ 5, 9, 12. Recognizing they do not have a claim under the Fair Credit Reporting Act ("FCRA") due to Cenlar's timely corrections, Plaintiffs instead try to assert a violation of RESPA's error correction requirements. Once again, Plaintiffs' allegations are not within the scope of RESPA because they do not address errors in "servicing" a loan.

Credit reporting does not fit within the definition of "servicing" provided by 12 U.S.C. § 2605(i)(3). Apart from a requirement that servicers temporarily suspend credit reporting after receipt of a "qualified written request," § 2605 and its implementing regulations do not articulate any requirements for credit reporting. *In Richissin v. Rushmore Loan Mgmt. Servs., LLC*, the District Court for the Northern District of Ohio

considered, and rejected, a claim that § 2605(k)(1)(c) applied to disputes of purported credit reporting errors:

> Congress and the Consumer Financial Protection Board are surely well-aware that credit reporting may occur, yet this activity is not expressly identified anywhere as a "servicing duty" or servicing "error." This may be because the Fair Credit Reporting Act is a remedial statutory scheme that covers credit reporting errors.

No. 20 CV 871, 2020 WL 7024848, at *4–5 (N.D. Ohio Nov. 30, 2020). Because Plaintiffs do not assert errors within the scope of the matters regulated by RESPA, this claim should be dismissed.

**B.     Cenlar timely corrected its credit reporting.**

Even if credit reporting errors fell within the scope of RESPA, Plaintiffs would have no basis for a RESPA claim because Cenlar corrected any errors by furnishing corrected information in response to disputes submitted by Plaintiffs to the credit reporting bureaus. Cenlar responded to the first credit reporting dispute on August 16, 2021, and then again on September 18, 2021, and October 28, 2021, each time reporting the Plaintiffs were current. **Ex. A-11**; SOF at ¶¶ 5, 9, 12. Although Defendants have no control over the credit bureaus' implementation of these corrections, records produced by the bureaus confirm that these corrections were received. **Exs. B, C,** and **D;** SOF at ¶¶ 6, 7, 13.

Plaintiffs have produced correspondence which they assert shows other creditors continued to rely on negative credit reporting information for several months after Cenlar submitted corrections. Whether or not this is true, it does not negate the timely corrections submitted by Defendants, who have no control over subsequent implementation of corrections submitted to the credit bureaus. RESPA does not assign strict liability for

errors, but instead only requires the servicer to take "timely action" to address errors. *See generally* 12 U.S.C.A. § 2605. Because Cenlar timely submitted corrections, Defendants are entitled to summary judgment on the RESPA claim.

**II.     Plaintiffs cannot meet the elements of the Arizona Consumer Fraud Act.**

   **A.  Defendants have not engaged in deception.**

The Arizona's Consumer Fraud Act ("ACFA") prohibits deception, fraud, misrepresentation, or concealment of a material fact in connection with sale or advertisement of merchandise. *See* A.R.S. § 44-1521 et seq.   ACFA requires proof of a false promise or misrepresentation in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury. *Id.*; *Zoldessy v. MUFG Union Bank, N.A.*, No. CV-20-08329-PCT-SPL, 2021 WL 1733398, at *3 (D. Ariz. May 3, 2021); *Watts v. Medicis Pharm. Corp.,* 239 Ariz. 19, 28, 365 P.3d 944, 953 (2016).

Plaintiffs allege Defendants somehow employed "bait and switch" tactics in the modification.  The evidence unequivocally shows this allegation to be false.  The terms of the trial payment plan offered to Plaintiffs on June 1, 2021, described the projected terms for their modification, including the estimated new principal balance, interest rate, and projected principal and interest payment.  *See* **Ex. A** at ¶ 13, **Ex.  A-7**; SOF at ¶ 3. The September 3, 2021, permanent modification offer sent to Plaintiffs did not materially change these terms, and in fact offered Plaintiffs a slightly lower principal balance, interest rate, and monthly payment than the projected terms in the trial payment plan letter.  *See* **Ex. A ¶ 14, Ex. A-8**, **Ex. A-9**. SOF at ¶¶ 3, 8. Plaintiffs accepted these terms, presumably because it allowed them to bring their loan current and resume making payments, which

they needed to do to qualify for the refinance they wanted. Because there was no false promise regarding their modification, Plaintiffs cannot meet the first element of their ACFA claim. Therefore, Plaintiffs' ACFA claim fails as a matter of law and should be dismissed with prejudice.

### B. Communications regarding a loan modification are not the "sale or advertisement of merchandise"

Furthermore, communications regarding a loan modification are not the "sale or advertisement of merchandise" under the ACFA. Merchandise is defined in the statute as "objects, wares, goods, commodities, intangibles, real estate or services," while "sale" means "any sale, offer for sale or attempt to sell any merchandise for any consideration, including sales, leases and rentals of any real estate subject to any form of deed restriction imposed as part of a previous sale." Ariz. Rev. Stat. § 44-1521. The District Court has previously ruled that modifications and foreclosure intervention do not fall within this definition because they only change the terms for an existing debt. *See Rich v. BAC Home Loans Servicing LP*, No. CV-11-00511-PHX-DLR, 2014 WL 7671615, at *10 (D. Ariz. Oct. 9, 2014), *aff'd sub nom. Rich v. Bank of Am., N.A.*, 666 F. App'x 635 (9th Cir. 2016); *Zoldessy v. MUFG Union Bank, N.A.*, No. CV-20-08329-PCT-SPL, 2021 WL 1733398, at *3 (D. Ariz. May 3, 2021). As in *Rich* and *Zoldessy*, this Court should find that communications concerning modification of the Loan do not constitute the "sale or advertisement of merchandise" and do not state a claim under the ACFA.

### C. Plaintiffs cannot show injury from the modification.

Finally, Plaintiffs cannot show they suffered any actionable damages as a result of the modification. On appeal in the *Rich* case, the Ninth Circuit held that alleged

misrepresentations in connection with a trial payment plan did not support the damages element of an ACFA claim where the borrower was not entitled to the modification they wanted, and thus were no worse off as a result of the alleged misrepresentation regarding the prospective modification. *Rich v. Bank of Am., N.A.*, 666 F. App'x 635, 638 (9th Cir. 2016). As in *Rich*, Plaintiffs did not have a "right" to a loan modification of their choosing.[2] Because Plaintiffs did not have a right to a modification better than the one they received, any claim under the ACFA fails as a matter of law and must be dismissed.

### III. Plaintiffs' negligence claim fails because it is barred by the economic loss rule, and because Plaintiffs do not allege they were induced to go into default based on a false promise to modify

Plaintiffs additionally bring a claim for negligent undertaking. This claim is barred by the economic loss rule, which "limit[s] a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 323, 223 P.3d 664, 667 (2010).

In the mortgage lending context, Arizona state courts have found a negligent undertaking claim under the Good Samaritan Doctrine in the limited circumstance when a lender induces a borrower to default on his loan payments by promising a modification if he defaults, then refuses to honor the promised modification. *See Steinberger v. McVey ex rel. Cnty. of Maricopa*, 234 Ariz. 125, 138, 318 P.3d 419, 432 (Ct. App. 2014). The *Steinberger* Court "emphasize[d] that our holding is limited to the particular allegations of

---

[2] Indeed, a loan agreement that Plaintiffs had an unfettered right to modify would be illusory and unenforceable due to lack of mutuality of obligation. *See Coup v. Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931, 950 (D. Ariz. 2011); *1617 Westcliff LLC v. Wells Fargo Bank N.A.*, 686 F. App'x 411, 413 (9th Cir. 2017).

this case" and set out the following elements for a claim against a lender under the Good Samaritan Doctrine:

> Specifically, a lender may be held liable under the Good Samaritan Doctrine when: (1) a lender, or its agent/representative, induces a borrower to default on his or her loan by promising a loan modification if he or she defaults; (2) the borrower, in reliance on the promise to modify the loan, subsequently defaults on the loan; (3) after the borrower defaults, the lender or its agent/representative negligently processes or fails to process the loan modification, or due to the lender/agent/representative's negligence, the borrower is not granted a loan modification; and (4) based on the default, the lender subsequently forecloses on the borrower's property. *Id.* !

The circumstances in *Steinberger* bear no relationship to this case. Plaintiffs were not induced to go into default, were not foreclosed on, and were in fact offered a modification, which they accepted. The District Court has refused to find a negligence claim under similar circumstances. *See Bergdale v. Countrywide Bank FSB*, No. CV-12-8057-PCT-SMM, 2014 WL 12643162, at *3 (D. Ariz. May 23, 2014) (distinguishing facts from *Steinburger* where the loan was not foreclosed and borrower was permitted to modify loan). As in *Bergdale*, a negligence claim is simply not cognizable in this context.

**IV.     The Court should grant partial summary judgment as to any damages from Plaintiffs' payments on their refinanced loan in 2022.**

Plaintiffs voluntarily did a cash-out refinance of their loan in June 2022 with United Trust Bank. As part of the refinance, Plaintiffs obtained funds to pay off $36,283.00 in credit card debt and received $101,297.72 in cash. *See* **Exs. E** and **F**. The refinanced loan had an interest rate of 4.75%, significantly higher than the 3.375% interest rate the Plaintiffs had under the terms of the Modification Agreement with Defendants. *See id.*

Plaintiffs refinance was clearly voluntary and in accordance with their intentions expressed as early as May 28, 2020. *See* **Ex. A** at ¶ 12. Nevertheless, Plaintiffs claim

$114,666.83 in damages from the "increase in interest rate and closing costs when refinancing with United Trust." *See* **Ex. H** (Responses to Interrogatories). Although Plaintiffs suggest the refinance was delayed by adverse credit reporting, in fact Plaintiffs could not get a new VA loan until they met a 6-month VA "seasoning" requirement. *See* 28 CFR 36.4306(c)(2); 83 FR 64459-01. In his deposition testimony, Mr. Calcut acknowledged the reason for the delay in closing the refinance was that he "had to complete six months of payments before United Trust or anybody else would touch me" following the modification. **Ex. G** 112:4 – 113: 17; SOF at ¶ 15.

Any damages from the UTB refinance are also barred by the voluntary payment doctrine, providing that "except where otherwise provided by statute, a party cannot by direct action or by way of set-off or counterclaim recover money voluntarily paid with full knowledge of all the facts, and without any fraud, duress, or extortion." *Hannibal-Fisher v. Grand Canyon Univ.,* 523 F. Supp. 3d 1087, 1099 (D. Ariz. 2021). Plaintiffs have not sought rescission as to any of these transactions by which they claim to be injured, and should not recover for their voluntary decision to refinance at a higher interest rate.!

**V.    The Court should grant partial summary judgment as to pecuniary and reputational damages from credit reporting**

Plaintiffs have claimed in discovery responses they have suffered "a sum in excess of $75,000.00 each" for damage to credit due to "delays in correcting the negative and false credit reporting." *See* **Ex. H**. Plaintiffs likewise seek damages for "[a] sum in excess of $75,000.00 each" for damage to reputation from "negative and false credit reporting." *See id.* Plaintiffs appear to acknowledge that past adverse credit reporting for the Loan has

been removed and do not contend that such information continues to affect their credit. Nor have Plaintiffs articulated any specific loss they have suffered due to credit reporting.

The evidence produced in this case shows Plaintiffs were unable to refinance their property prior to June 2022, not because of poor credit, but because of the need to meet the VA's seasoning requirement. *See* **Ex. G** 112:4 – 113: 17; SOF at ¶15.  Likewise, Plaintiffs allege they have experienced "cancelation of certain credit accounts, denials of special credit offers, or credit increase denials" but have not articulated how any of these issues resulted in pecuniary loss.  Especially given Plaintiffs paid off their outstanding credit card debt in the June 2022 refinance, they must forecast some evidence of actual loss for this claim to survive summary judgment.

Likewise, Plaintiffs must proffer some evidence of loss of reputation for their claim for reputational injury. *See Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 4583625, at *5 (D. Ariz. Aug. 10, 2020) (finding that summary judgment was proper where "Plaintiffs have pointed to no evidence that creates a triable issue as to whether they have suffered damaged reputation . . . ."). Plaintiffs have not provided any evidence that their reputation or standing in the community has suffered from prior credit reporting, which has been corrected.  In her deposition, even Mrs. Calcut appeared to be unaware of adverse consequences from credit reporting, denying that she was aware of any negative reporting on her credit and stating, "I only have one credit card, and it's always good -- from Kohl's." *See* **Ex. I** (Geri Calcut Dep.) 15: 7-24.  Because Plaintiffs have not presented evidence of actual loss from credit reporting or injury to reputation, the Court should grant partial summary judgment as to these categories of damages.

### VI.  The Court should grant partial summary judgment as to punitive damages

To recover punitive damages in Arizona, a plaintiff must show the "defendant's evil hand was guided by an evil mind." *Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986).  An "evil mind" may be found when the defendant either "intended to injure the plaintiff" or "consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others." *Id*.  There is no evidence supporting such findings against Defendants.  On the contrary, the evidence shows Defendants offered Plaintiffs a VA Disaster Modification, allowing them to bring their loan current and meet their objectives by resuming payments.  When Plaintiffs disputed credit reporting for the month of July 2021, Defendants corrected the prior credit reporting error.  Because there is no evidence supporting an award of punitive damages, the Court should grant partial summary judgment as to this category of damages.

### CONCLUSION

For each of the reasons stated above, Defendants ask the Court to grant summary judgment on each of Plaintiffs' claims.  In the alternative, Defendants request partial summary judgment as to each category of Plaintiffs' damages lacking supporting evidence.

Respectfully submitted this 23rd day of June, 2023.

s/ G. Benjamin Milam
G. Benjamin Milam *(Pro Hac Vice)*
BRADLEY ARANT BOULT CUMMING LLP
214 North Tryon Street, Ste. 3700
Charlotte, NC 28202
Telephone: (704) 338-6000
bmilam@bradley.com

Christian W. Hancock - 027744
BRADLEY ARANT BOULT CUMMING LLP
214 North Tryon Street, Ste. 3700
Charlotte, NC 28202
Telephone: (704) 338 6089
chancock@bradley.com

*Attorneys for Defendants Paramount Residential Mortgage Group, INC., and Cenlar FSB*