Justin Johanson - 033329
JOHANSON PARKER
21920 E. Pegasus Parkway
Queen Creek, AZ 85142
Telephone: (480) 845-2030
jjohanson1129@gmail.com

*Attorney for Plaintiffs George and Geri Calcut*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## PHOENIX DIVISION

| | |
|---|---|
| George Calcut, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> Paramount Residential Mortgage Group, Inc., <br><br> *et al* <br><br> Defendants. | Case No. 2:22-cv-01215-JJT <br><br> **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs George Calcut and Geri Calcut, by their undersigned counsel, hereby file this Memorandum in Opposition to Defendants' Motion for Summary Judgment. (ECF. 50).[1]

**I.     ARGUMENT**

**A.     Defendants violated RESPA by breaching their standard servicer duties imposed by Regulation X, to which PRMG has admitted, by failing to provide accurate information regarding loss mitigation options under the CARES Act, and VA guidelines.**

---

[1] For the purposes of efficiency, the Plaintiffs incorporate by reference their arguments in support of their Motion and Memorandum for Partial Summary Judgment (ECF. 46)(MPSJ) and their Annotated Statement of Material Facts and Appendix of Exhibits thereto (ECF 45). For brevity those arguments will not be repeated except to the extent necessary to respond to the Defendants' Memorandum of Law (ECF. 50-1) filed in support of their Motion.

As has become common place in the relationship between the Parties, the Defendants misstate Plaintiffs' actual claims, ignore or conceal material facts and evidence, and instead try to spin a different picture of the case entirely than what is before the Court. Plaintiffs have clearly stated that "the Calcuts are not arguing that they should have been granted one loan modification option over another." MPSJ at Fn. 6. Rather the Plaintiffs are asserting that the Defendants failed to provide accurate information about loss mitigation options available under the CARES Act and the VA guidelines (**Calcut 18, 19, 21)**. In addition, Defendants furnished derogatory information about the Calcuts to the CRAs even though they were current when they entered their CARES Act forbearance program and were barred as a standard servicer duty from doing so (**Calcut 24, 26**) (Answer ¶3, 50).

Defendants try to escape their duty to provide accurate information by asserting that a "request for modification of a loan agreement … does not concern the loan's servicing." D. Mem. at 6 (citing *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 667 (9th Cir. 2012). Defendants' reliance on *Medrano* is misplaced. First *Medrano* involved a pre-Dodd-Frank[2] dispute between the borrower and the servicer based on the monthly payment towards the loan being different than what the original broker had allegedly represented to the borrower. *Id* at 664.  In finding that Flagstar did not owe a duty to the plaintiffs to respond to their letters the court stated "'Servicing,' so defined, does not include the transactions and circumstances surrounding a loan's origination—facts that would be relevant to a challenge to the validity of an underlying debt or the terms of a loan agreement." *Id*. at 666-667. Thus,

---

[2] RESPA was materially amended by the DODD–FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, PL 111-203, July 21, 2010, 124 Stat 1376 its amendments were not effective at the time of the occurrence subject to *Medrano*.

the modification that the court was referring to in *Medrano* was the request by the borrower to honor what their broker allegedly promised them at origination. That is not the Calcuts case and here there is no question that loan modification and loss mitigation generally involving servicing. 12 CFR §§ 1024.38, 1024.41. In addition, in Dodd-Frank, the Congress expressly expanded RESPA's scope as evidence by 12 U.S.C.A. § 2605(k) which expanded new standards on the Defendants' servicing conduct to include loss mitigation.

Under RESPA it is a standard servicer duty to "provide accurate information regarding loss mitigation options available to a borrower" and to "identify with specificity all loss mitigation options for which borrowers may be eligible pursuant to any requirements established by an owner or assignee of the borrower's mortgage loan." 12 CFR § 1024.38(b)(2)(i)&(ii). As stated in Plaintiffs MPSJ, the Defendants represented to the Calcuts over and over that they were monitoring changes to the available loss mitigation programs (**Calcut 4**); yet, despite this representation, the Defendants either did not monitor changes, concealed information regarding loss mitigation options from the Calcuts, and/or provided the Calcuts false information which they never corrected; even after Mr. Calcut requested they do so (**Calcut 7, 12, 16-17**). In fact, even after Mr. Calcut twice complained to the CFBP the Defendants twice erroneously responded to the CFPB and the Calcuts that the VA does not offer deferral programs (when it actually did so) (**Calcut 23**). It was not until the corporate representative of PRMG was deposed in late March 2023, that PRMG finally admitted this was false (**Calcut 23**).

Plaintiffs are not asserting they were entitled to a deferral but rather that they were given false and inaccurate information concerning VA loss mitigation options repeatedly

after previously being informed on a July 17, 2021 phone call where a Cenlar representative informed Mr. Calcut they were going to be getting a deferral as part of a streamline modification (**Calcut 7**) and then told him on another phone call on August 18, 2021 that the VA does not allow deferrals (**Calcut 17**) when it actually did so. Defendants argue that "RESPA does not impose a duty on a servicer to provide any borrower with any specific loss mitigation option." D. Mem. at 6 (citing *Garcia v JPMorgan Chase Bank NA*, 2017 WL 1311668 at *11 (D. Ariz. 2017)). Again, Plaintiffs are not asserting that Defendants had a duty to provide a specific loss mitigation option but that they had a duty to provide accurate information and to review the Calcuts for all options instead of offering a single option without review of all available options it knew were available. Put another way, offering one thing and then falsely denying that same even exists is far from providing accurate information. If Plaintiffs' MPSJ is not granted there is at minimum a question of fact as to whether Defendants' acts and omissions were a violation of RESPA. 12 U.S.C.A. § 2605(k)(1)(C)&(E).

**B.     Defendants violated RESPA by breaching their standard servicer duties**

Again, Defendants misconstrue Plaintiffs' claims and assert that Plaintiffs contend that Defendants were obliged to offer them a modification under the COVID-19 Veterans Assistance Partial Claim Program ("COVID-19 VAPCP") (D. Mem at 7). The COVID-19-VAPCP but was one option the Defendants failed to evaluate, consider, inform, concealed, and/or denied the existence of (**Calcut 21**).

RESPA requires the Defendants to "[e]valuate the borrower for all loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(c)(1)(i). There is no dispute that

the Defendants did not consider the Calcuts for all available options under the VA guidelines governing the Calcut Loan (**Calcut 21**). The Defendants did not even consider the Calcuts for the Streamline Modification (**Calcut 10**) Cenlar's authorized representatives told Mr. Calcut would be available before the CARES Act forbearance ended (**Calcut 7**). As discussed more thoroughly in Plaintiffs' MPSJ the VA had issued circulars concerning the VA's various loss mitigation options and providing servicers the preferred order of offering those options to assist borrowers and a step-by-step process to follow. *See* MPSJ at 10. Cenlar understood this circular to be instructions for servicers to follow to assist borrowers who met the required conditions; which the Calcults did (**Calcut 20**). Despite these instructions, the Calcuts were not considered by the Defendants for a VA Disaster Extend Modification, loan deferment, or a COVID-VAPCP at any time including during the trial period of the disaster modification before it became final (**Calcut 15**).

Notably, Defendants do not even put forth what other VA loss mitigation options they considered for the Calcuts. *See* Def. SOMF Ex. A at ¶ 13 (ECF 50-1 page 5). If Defendants did consider the Calcuts for any other loss mitigation option(s)[3] and denied them, then they were required to inform the Calcuts that they "[have] the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal." 12 C.F.R. § 1024.41(c)(1)(ii). At bottom, there is a material question of fact what if any other options the Plaintiffs were evaluated as required by regulation and law.

**C.   Defendants violated the Standard Servicer Duties as Defined by the CARES Act,**

---

[3] Based upon PRMG's letter dated June 1, 2021 Plaintiffs do not believe they were evaluated for any other loss mitigation options (**Calcut 41).**

- 5 -

**VA guidelines and RESPA by falsely reporting the Calcuts as delinquent to the credit reporting agencies.**

Yet again Defendants attempt to paint an incomplete and misleading version of the facts of this case and the nature of Plaintiffs' claims. Defendants want to have this Court believe that because RESPA only addresses credit reporting in one instance as a servicing duty, i.e. the suppression after a qualified written request, then Plaintiffs' claims must fail. D. Mem. at 8. This is incorrect for a number of reasons, especially since no law imposes any duty upon the Defendants to "to report credit information at all." *Evans v. Trans Union L.L.C.*, 2011 WL 672061, at *3 (S.D. W. Va. Feb. 14, 2011. *See also Consumer Fin. Prot. Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System: A Review of How the Nation's Largest Credit Bureaus Manage Consumer Data 15 (2012)*, available at www.consumerfinance.gov ("Reporting to credit bureaus and other consumer reporting agencies by creditors is voluntary and historically has been. Not all creditors report information about their borrowers. Some creditors report information about users of some of their credit products, but not others."). In addition, since RESPA is a remedial statute, it "should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), *Medrano* 704 F.3d at 665-66 (RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose").

First, Defendants completely ignore the CARES Act under which Congress established that a furnisher of credit information, like Cenlar here in the name of PRMG (**Calcut 24**)(Answer ¶3, 50), was not permitted to report a borrower like the Calcuts who entered their CARES Act forbearance as current as delinquent when they exited their

forbearance.[4] Additionally, The VA on April 8, 2020 issued Circular 26-20-12 which informed servicers that "[w]hen reporting credit information to credit bureaus, servicers must follow the CARES Act requirements for reporting a borrower's account as current or delinquent."[5] Thus, following the passage of the CARES Act it became a standard servicer duty for Defendants to comply with the CARES Act and not report Plaintiffs as delinquent while under forbearance but there is no dispute that the Defendants did so **(Calcut 24).**

Defendants were well aware of this requirement and informed the Calcuts of the same on numerous occasions (**Calcut 3**). Defendants have admitted they reported the Plaintiffs' loan as 180-days past due in July 2021(D. Mem. 8; **Calcut 24**). Defendant PRMG has admitted that Defendant Cenlar did not adhere to the requirements of the CARES Act (**Calcut 24**) and Cenlar has admitted that the reporting was supposed to have been suppressed (**Calcut 28**). This there is no dispute of material fact that the Defendants breached their standard servicing duties in relation to the Calcuts as set forth herein and in Plaintiffs MPSJ and thus violated 12 U.S.C.A. § 2605(k)(1) and are liable under § 2605(f).

Defendants' reliance on *Richissin v. Rushmore Loan Mgmt. Servs., LLC*, 2020 WL 7024848 (N.D. Ohio 2020) is also misplaced. To begin with, *Richissin* concerned events that occurred prior to the passage of the CARES Act and the issuance of the VA guideline

---

[4] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 4201 (2020) ("if a furnisher makes an accommodation with respect to…the furnisher shall—(I) report the credit obligation or account as current . . .)

[5] *See* https://www.benefits.va.gov/HOMELOANS/documents/circulars/26_20_12.pdf. Plaintiffs request the Court take judicial notice of this fact pursuant to Fed. R. Evid. 201 because the authenticity of guidelines and public records are not in question and they are central to Plaintiffs' allegations. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

cited *supra* which established the standard servicer duty at issue here: not to credit report a current loan as delinquent when it went into a CARES Act forbearance. Second, *Richissin* involved the defendant's breach of a settlement agreement and not a violation of a "standard servicer duty" set forth under a statute. *Id.* at *4. Third, Pursuant to 12 C.F.R. § 1024.41(c)(2)(iii) and 38 C.F.R. 36.4301 forbearance is a loss mitigation option[6] and thus much like stated in § II. A. *supra*, Defendants failure to provide accurate information as required by § 1024.39 is a violation of Reg. X - 12 U.S.C.A. § 2605(k)(1)(E).

      Defendants next try to escape liability for their admitted failures and violations by asserting that Cenlar timely corrected the credit reporting errors (months after the fact). Whether the Defendants took the necessary steps and followed proper procedures to correct the credit reporting errors is clearly a question of material fact prohibiting a grant of summary judgment. While Defendants' have put forth a number of ACDVs attempting to show they corrected the erroneous negative and disparaging reporting it is a question of fact whether this went far enough, especially in light of the fact that Mr. Calcut had to repeatedly call PRMG to report that the error remained in addition to filing two complaints with the CFPB (**Calcut 22, 25**). At no time have Defendants indicated they took any action to verify that a correction took place even after the complaints and a promise during a call with Cenlar acting as PRMG that the error would be escalated to the credit department so they could fix it (**Calcut 25**).

      It is undisputed that errors remained on the Calcuts credit reports even after

---

[6] *See also* VA Servicer Handbook M26-4, February 26, 2019, Chapter 5: Loss Mitigation at § 5.05, which the Court can take judicial notice pursuant to Fed. R. Evid. 201 for the same reasons in the previous FN 5.

Defendants allegedly attempted to correct it (**Calcut 26, 27, 32**) and that this erroneous reporting had serious consequences for the Calcuts including but not limited to: Mr. Calcuts Synchrony card being closed in August of 2021 (**Calcut 31**), the Calcuts being denied for a refinance by New American Funding in November of 2021 (**Calcut 32**), and according to Plaintiffs' expert being forced to wait until May 2022 to refinance their PRMG/Cenlar loan with another VA guaranteed loan at a higher rate (**Calcut 36**).  Mr. Calcut called PRMG/Cenlar to report the error on July 17, 2021, giving the Defendants the benefit of the doubt the earliest the Defendants failed attempt to correct the error was August 16, 2021. By this time the damage had already been done.  Thus, it is undisputed that the Defendants violated the CARES Act, VA guidelines, and RESPA; it is at best a question of fact as to whether Defendants took timely action to correct the error under the circumstances presented.  *Evans*, 2011 WL 672061, at *3; CFPB, *Key Dimensions and Processes in the U.S. Credit Reporting System,* www.consumerfinance.gov (quoted *supra*).

### D.  Defendants violated the Arizona Consumer Fraud Act.

The Arizona Consumer Fraud Act ("ACFA") prohibits "any deception, deceptive or unfair act or practice…false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." A.R.S. § 44-1522. To state a claim under the ACFA, a plaintiff must allege (1) a false promise, representation, concealment, or omission; (2) made in connection with the sale of merchandise; and (3) resulting and proximate injury. *Loomis v. U.S. Bank*

*Home Mortg.*, 912 F. Supp. 2d 848, 856 (D. Ariz. 2012).

The Defendants contend loss mitigation related to loan modifications do not qualify as a "sale" under the ACFA. However, based on the broad statutory definition of "sale," (A.R.S. § 44-1521(7)), the totality of the modification negotiations constituted a new sale of lending services at a higher cost to plaintiffs. First, the lending of money is a sale of services covered by the ACFA. *Villegas v. Transamerica Financial Services, Inc.*, 708 P.2d 781, 783 (Ariz. Ct. App. 1985) (A loan "is the sale of the present use of money on a promise to repay in the future"). In addition, the attempt by publication, dissemination, solicitation, or circulation, oral or written, to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise" constitutes an advertisement under the ACFA. *Id*. In *Narramore v. HSBC Bank USA, N.A.*, 2010 WL 2732815 at *11 (D. Ariz. 2010), this Court determined that "any oral negotiations to restructure a consumer loan [are] an 'advertisement' within the meaning of the [ACFA]."

Here, through oral and written promises, the Defendants represented to the Calcuts that the modification would allow them to resume their regular monthly payments after exiting the CARES Act forbearance, with the suspended payments added to the end of their loan. (**Calcut 7**). However, the modification Defendants subsequently offered Plaintiffs did not contain these terms and instead increased both the interest rate and monthly payment amount. Under *Villegas* and *Narramore*, this functionally led Plaintiffs to purchase continued lending services on less favorable terms – a new sale under the ACFA–while the Defendants concealed and omitted from the Plaintiffs other options were available.

The Defendants rely heavily on *Rich v. BAC Home Loans Servicing*, 2014 WL

7671615 (D. Ariz. 2014) and *Zoldessy v. MUFG Union Bank, N.A.*, 2021 WL 1733398 (D. Ariz. 2021), which found loan modification discussions did not constitute a sale. But Defendants fail to mention *Myrick v. Bank of Am. Co*. 2013 WL 12097453, at *4, in which "this Court has previously held that the ACFA 'will apply to actions in connection with the origination of a loan or a loan modification." (citing *Bergdale v. Countrywide Bank FSB*, 2012 WL 4120482, at *5 (D. Ariz. Sept. 18, 2012)). The Calcuts' facts are more akin to *Myrick* which involved contradictory representations and the promised terms of the modification (see *Myrick* at *1) rather than *Rich* and *Zoldessy* where there was either only general discussions about a modification or a lack of false promises.

Relying on Defendants' promises, Plaintiffs exited forbearance, only to be offered a modification materially inconsistent with the original representations and guidelines governing the Calcut's loan. (**Calcut 7, 9**). In sum, the Defendants' actions bring this case withing the scope of the ACFA. The Plaintiffs suffered tangible injury from increased interest/payments in the modification caused by Defendants' bait-and-switch tactics. Plaintiffs' injury stems directly from the false promises and omissions, not the denial of any particular modification.

**E.     Defendants violated the Arizona Good Samaritan Doctrine and thus engaged in negligence.**

Defendants wrongly assert that Plaintiffs' negligence claim is barred by the economic loss rule. The Arizona Supreme Court extended the Good Samaritan Doctrine beyond ordinary physical harm to include economic harm. *Lloyd v. State Farm*, 176 Ariz. 247, 250 (Ariz. Ct. App. 1993), (citing *McCutchen v. Hill*, 147 Ariz. 401, 404 (Ariz. 1985)); *Jeter v. Mayo Clinic Ariz.*, 211 Ariz. 386, 402 (Ariz. Ct. App. 2005) (a person assuming a duty

under § 323 may, in addition to liability for physical harm, be liable for economic harm); *Renteria v. United States*, 452 F.Supp.2d 910, 914 (D. Ariz. 2006) (applying Arizona law, the court held that "Lloyd and Jeter make clear that the Good Samaritan Doctrine applies to economic harm"); *Silving v. Wells Fargo Bank, NA,* 800 F. Supp. 2d 1055 (D. Ariz. 2011)(explaining that the Good Samaritan Doctrine applies to economic harm and recognizing the doctrine applies to loan modification procedures in a mortgage foreclosure case).

Defendants' reliance on *Steinberger v. McVey*, 234 Ariz. 125 (Ariz. Ct. App. 2014) is too narrow as courts have expanded upon its holding, a fact which Defendant Cenlar should recognize having previously lost on this issue in this Court. In *Martinez v. Cenlar FSB,* 2014 WL 4354875 (D. Ariz. 2014) this Court stated:

> subsequent to the Steinberger case, at least one federal district court has said that Steinberger holds that the Good Samaritan doctrine permits a homeowner "to sue the bank if through the modification process: '(1) [the bank] undertook to render services to [plaintiff] that [it] should have recognized were necessary for the protection of [plaintiff's] property, (2) [the bank's] failure to exercise reasonable care while doing so increased the risk of harm to [plaintiff], and (3) [plaintiff] was in fact harmed because of [the bank's] actions.'

*Id.* at *10 (cleaned up). *See also Buff. v. U.S. Bank,* 2014 WL 7648937 at *7 (D. Ariz. 2014).

Similarly, here, Defendants' negligence is actionable despite Plaintiffs ultimately receiving a modification. The Plaintiffs exited their CARES Act forbearance in reliance on the Defendants' promises (**Calcut 9**) and Defendants negligently failed to offer the promised modification (**Calcut 10, 16, 17, 21, 22**) causing the Plaintiffs harm by increased costs of the modification which otherwise would have been avoided (**Calcut 11, 45**). For these reasons the Court should deny summary judgment on this issue.

**F.     It is a question of material fact whether the Calcuts' loan had to "season" and whether they were under duress and thus should be able to seek damages for the increase in interest under the refinanced loan with UTB.**

Much like the Defendants' failure to recognize the changes in loss mitigation options despite repeatedly informing Plaintiffs they were "monitoring investor guidelines" as discussed *supra*, the Defendants fail to recognize the changes in the VA guidelines relating to the "seasoning" requirement found at 28 CFR 36.4306(c)(2). In light of COVID-19, on June 30, 2020, the VA published Circular 26-20-25 explaining that the VA was relaxing the seasoning requirements for both cash-out refinance loans and for interest rate reduction refinance loans. (**Calcut 37-38**).  Specifically in the case of a cash-out refinance loan the circular states "lenders should not use a CARES Act forbearance as a reason to deny a Veteran a VA-guaranteed loan." And that the "VA will not consider a Veteran as an unsatisfactory credit risk, based solely upon the fact that the Veteran received some type of credit forbearance or experienced some type of deferred payment during the COVID-19 national emergency." (**Calcut 37**). Additionally in the case of an interest rate reduction loan the VA stated that "periods of forbearance cannot count toward seasoning; however, forbearance under the CARES Act does not, alone, cause the loan to fail to meet the seasoning standard.  If a loan being refinanced met seasoning requirements before a Veteran invoked a CARES Act forbearance, the seasoning requirement remains satisfied." (**Calcut 38**).

Thus, because the Calcuts had made at least 6 (six) consecutive timely payments towards the PRMG mortgage prior to entering the CARES Act forbearance the loan had and remained "seasoned." (**Calcut 39**).  It is simply a fictitious argument for the Defendants

to claim that "Plaintiffs could not get a new VA loan until they met a 6-month VA 'seasoning' requirement." D. Mem. at 14. Defendants further attempt to rely on Mr. Calcut's own deposition testimony that he had to complete six months of payments before he could refinance. *Id.* Not only is this absurd, it is yet another example of Defendants' chutzpah. Mr. Calcut is a retired 83-year-old disabled veteran with no expert knowledge regarding VA loans and was not "monitoring investor guidelines" as Defendants repeatedly claimed they were doing. (**Calcut 4**).

The voluntary payment doctrine is also not grounds for granting partial summary judgment on this issue.[7] This doctrine and why it should not apply was discussed prior in Plaintiffs' response to Defendants' Motion to Exclude Ms. Wilson but will reiterate Plaintiffs main points here.

First, until the dispositive motion deadline Defendants had not raised the voluntary payment doctrine and thus should be barred from doing so now. Courts view the voluntary-payment doctrine as an affirmative defense. *Stuart v. Glob. Tel\*Link Corp.*, 956 F.3d 555, 561 (8th Cir. 2020). *See also Baxter v. AmeriHome Mortgage Company, LLC*, 617 F.Supp.3d 346, 354 (D. Md. 2022)("To the extent the voluntary payment doctrine applies to this case at all, it is at best a fact-dependent affirmative defense to the merits of Plaintiff's allegations")(of note Cenlar is a party to the *Baxter* case). In general, "[i]n responding to a

---

[7] On a side note, Plaintiffs do not see where in Defendants' Ex. H Plaintiffs' claim an amount certain as to damages for the "increase in interest rate and closing costs." Rather, the $114,666.83 was one calculation that Plaintiffs' math expert Ms. Wilson computed based on amortization tables to compare what the increase in interest as applied to the PRMG payoff could cost the Calcuts under the terms of the UTB loan if it was paid timely and for the entire life of the loan. *See* Wilson Report (ECF. 53-1 at 3). This is the sum the Calcuts are personally liable.

pleading, a party must affirmatively state any avoidance or affirmative defense…" Fed. R. Civ. P. 8(c).  Defendants never plead or raised the voluntary payment doctrine in their Answer (ECF. 6), and even as recently as April 27, 2023 failed to raise it in their Supplemental Responses to Plaintiffs' Interrogatories.[8]

Second, the only case Defendants cite to *Hannibal-Fisher v. Grand Canyon Univ.*, 523 F. Supp. 3d 1087, 1099 (D. Ariz. 2021) (and even those relied on by that court)[9] involves different claims than this case.  In *Hannibal-Fisher* students paid money to the defendant University for tuition, fees, and other associated educational expenses based on the promise that the school would provide in person instruction. *Id.* at 1092.  Unfortunately, due COVID-19 the school was forced to switch to online instruction and the students filed suit to recover the monies paid.  The court held that "Plaintiffs did not pay with full knowledge of the facts. They paid GCU before knowing that GCU would instruct students to return home and move classes online. Therefore, the Court finds that Plaintiffs have plausibly alleged a claim for money had and received." *Id.* (citations omitted).  Plaintiffs can see but would disagree with Defendants if they were attempting to analogize *Hannibal-Fisher* to the payments the Calcuts made towards the PRMG trial payment plan and permanent loan modification but in no way does *Hannibal-Fisher* or other voluntary payment doctrine cases apply to a situation where the errors and omissions upon which the Plaintiffs relied cause forward looking monetary damages.

---

[8] PRMG's & Cenlar's Supplement and Amended Responses and Objections to Plaintiffs' First Interrogatories to Cenlar Interrogatory #1 (Apx. 330-331, 332-333).
[9] *See Brown & Bain, P.A. v. O'Quinn*, 2006 WL 449279 at *6 (D. Ariz. 2006)(Plaintiff could not recover attorney fees he had previously paid under a retainer agreement because he had "lawyer's remorse.")

Finally, even if the doctrine applied to the facts of this case, it is a question of fact whether the payments were paid with full knowledge of all the facts and whether the Calcuts were under any duress.  In this case, the Defendants' unfairly, deceptively, unfairly, and wrongly denied the existence of deferral programs altogether and the COVID-19 Waterfall programs, which the Defendants had a legal obligation to disclose under RESPA, Regulation X, and the VA guidelines.  Further, Defendants' erroneous credit reporting and failure to timely and properly rectify the same resulted in the Calcut loan not meeting the requirements to refinance at a lower interest rate and having to wait for the loan to "season" (**Calcut 40**).  These misrepresentations or misstatements, combined with the Defendants' negligent performance in undertaking their obligations under RESPA and Regulation X, nullifies the applicability of the voluntary payment doctrine, which stipulates that payments must be made without any fraud, duress, or extortion.

**G.    Plaintiffs are entitled to pecuniary and reputational damages from Defendants' erroneous credit reporting.**

First as discussed *supra*, Defendants' contention about the Calcut loan having to season is just simply incorrect. (See § II.F *supra*). The *Geiger*[10] case relied upon by the Defendants is a commercial case and dealt with false advertising.  This is completely different from the harm caused the Calcuts which includes being denied for refinancing, closure of credit accounts, and garden variety emotional distress. (Tarter Report. ECF. 49-1 at page 31-36). These type damages are clearly questions of fact for the jury and available under the claims asserted. *Yap v. Deutsche Bank Nat. Trust Co.* 2018 WL 4095167 at *3 (D.

---

[10] *Geiger v. Creative Impact Inc.,* 2020 WL 4583625 at *5 (D. Ariz. 2020).

Ariz. 2018)(" Even emotional distress and mental anguish may constitute actual damages under RESPA").

### H. Plaintiffs are entitled to seek an award of punitive damages.

"Summary judgment for defendant on the issue of punitive damages must be denied if a reasonable jury could find the requisite evil mind by clear and convincing evidence." *Temple v. Hartford Ins. Co. of Midwest*, 40 F.Supp.3d 1156, 1166 (D. Ariz. 2014). Here a reasonable jury could find the circumstantial evidence of Cenlar's previous pattern and practices of mortgage servicing which the OCC has found to be unsafe and unsound (**Calcut 29**) could rise to the level of evil intent when looking at Defendants' actions here in providing false information about loss mitigation options and erroneous credit reporting. If the jury finds that the Defendants violated the ACFA that is sufficient to support the recovery of punitive damages. *Howell v. Midway Holdings, Inc*. 362 F.Supp.2d 1158, 1165 (D. Ariz. 2005). There is no dispute that the Defendants had multiple opportunities to correct their errors but they failed to do so and PRMG as the principal to Cenlar knew Cenlar was acting unsafely and unsoundly but choose to ratify Cenlar's conduct under its name**. (Calcut 22-23).** That conscience disregard may also be a basis for the fact finder to award to the Plaintiffs punitive damages. RAJI (Civil) PIDI 4 (7th ed.).

### III. CONCLUSION

For the above stated reasons this Court should DENY Defendants' Motion for Summary Judgment and GRANT Plaintiffs' Motion for Partial Summary Judgment.

DATED: July 20, 2023

Respectfully submitted,

*s/Justin Johanson*
Justin Johanson #033329
JOHANSON PARKER
jjohanson1129@gmail.com
21920 E. Pegasus Parkway
Queen Creek, AZ 85142
(480) 845-2030 (Phone)


*/s/Brent S. Snyder*
Brent S. Snyder
Admitted *Pro Hac Vice*
Brentsnyder77@gmail.com
2125 Middlebrook Pike
Knoxville, TN 37921-5855
(865) 546-2141
Brentsnyder77@gmail.com


*s/ Phillip Robinson*
Phillip Robinson
Admitted *Pro Hac Vice*
Consumer Law Center LLC
phillip@marylandconsumer.com
10125 Colesville Rd., Ste. 378
Silver Spring, MD 20901
(301) 448-1304 (Phone)
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I do hereby certify that on July 20, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Christian W. Hancock
Benjamin Milam
Bradley Arant Boult Cummings, LLP
Truist Center
214 North Tryon Street, Suite 3700
Charlotte, NC 28202

*Counsel for Defendants*

                                        <u>*/s/Brent S. Snyder*</u>
                                        Brent S. Snyder